UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:26-CV-23481-ALTMAN/HERNANDEZ

MARLINE MONESTIME,

Plaintiff,

vs.

CITY OF NORTH MIAMI BEACH,
DARVIN WILLIAMS,
ALGO LAW FIRM, LLP,
IGNACIO ALVAREZ,
FRANKLIN ROIG, AND
NORBERTO HERNANDEZ A/K/A
ROBERT HERNANDEZ,

Defendants.
_______________________________/

# AMENDED COMPLAINT

Plaintiff, Marline Monestime, sues Defendants, City of North Miami Beach, Darvin Williams, ALGO Law Firm, LLP, Ignacio Alvarez, Franklin Roig, and Norberto Hernandez a/k/a Robert Hernandez, as follows:

## ***Parties, Jurisdiction, and Venue***

1. **Plaintiff, Marline Monestime ("Ms. Monestime")**, is over 18 years old and a *sui juris* resident of Miami-Dade County, Florida, at all times material.

2. The City of North Miami Beach employed Ms. Monestime from approximately June 2022 until February 27, 2026.

3. Ms. Monestime held various positions with the City of North Miami Beach, including CRA Specialist, Economic Development Specialist, Chief of Staff, and Interim Assistant City Manager.

4. At all times material, Ms. Monestime was a faithful employee of the City who performed her duties at or above the level expected of her and discharged the duties she owed to the City and the public she served with integrity.

5. **Defendant, City of North Miami Beach ("City"),** is a *sui juris* political subdivision of the State of Florida, a local government, and a Florida municipal corporation in this District.

6. The City is a "person" within the meaning of 42 U.S.C. §1983, and a commission-manager system of local government under which its City Manager has final decision and policy-making authority.

7. The City acted under color of law during all times material by and through its authorized officials, employees, and agents.

8. At all times material, the individuals associated with the City, as more fully described and identified below, were employees and public officials of the City.

9. **Defendant, Darvin Williams ("Williams"),** is over 18 years old and served as the City Manager of the City of North Miami Beach.

10. The City voted to appoint Williams as its City Manager on January 20, 2026.

11. At all times material, Williams acted under color of state law in his role as City Manager and as final policymaker for the City.

12. At all times material, Williams was the City's Appointing Authority, or was the City official exercising the powers of the Appointing Authority, because Rule 2.1 of the City's Civil Service Rules defines "Appointing Authority" as the "City Manager or designee."

13. At all times material, Williams had authority under Rule 14.2 of the Civil Service Rules to establish the order of layoffs.

14. Williams had authority as City Manager and Appointing Authority over discipline, layoff decisions, and the employment action at issue; the availability of Civil Service Board review depended on whether the action was treated as a layoff or discipline under the Civil Service Rules.

15. **Defendant, ALGO Law Firm, LLP ("ALGO")**, is a limited liability partnership, private law firm, and *sui juris*.

16. ALGO acted, at all times material, through its officers, directors, partners, employees, and agents.

17. **Defendant, Ignacio Alvarez ("Alvarez"),** is an attorney authorized to practice law in Florida by The Florida Bar, over 18 years old, *sui juris*, and the founder/managing partner of ALGO.

18. **Defendant, Franklin Roig ("Roig")**, is over 18 years old, *sui juris*, and at all

times material, an authorized agent of ALGO who acted within the course and scope of his employment with ALGO.

19. **Defendant, Norberto Hernandez ("Hernandez**"), also known as Robert Hernandez, is over 18 years old, *sui juris*, and at all times material, an authorized agent of ALGO who acted within the course and scope of his employment with ALGO.

20. Defendants ALGO, Alvarez, Roig, and Hernandez are collectively referred to as the "ALGO Defendants."

21. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 in that this is an action to redress violations of Ms. Monestime's Constitutional rights and pendent jurisdiction over her Florida common law claim(s) under 28 U.S.C. § 1367 because those claims arise from the same case or controversy.

22. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b), as all events giving rise to this cause of action occurred in this judicial district and because the City is located in Miami-Dade County, Florida.

23. Any conditions precedent to filing this lawsuit occurred and/or were satisfied by Ms. Monestime.

24. Ms. Monestime retained the undersigned counsel and agreed to pay a reasonable fee for all services rendered.

***Background Facts***

**A. <u>Ms. Monestime's Employment and Civil Service Rights</u>**

25. The City initially employed Ms. Monestime as a CRA Specialist from June 2022 to September 2022, and then as an Economic Development Specialist from October 2022 to August 2023.

26. Ms. Monestime served as Chief of Staff for the Mayor of the City from August 2023 to February 2026 and as the City's Interim Assistant City Manager from June 2025 to February 2026.

27. The City adopted Civil Service Rules & Regulations, last revised by Resolution R2017-114 on September 19, 2017, under Article VII of the City Charter.

28. The City's Civil Service Rules establish a comprehensive framework of procedural protections for employees in Civil Service, including rules for appointments, classified status,

layoffs, separation of employees from employment through layoffs or organizational reductions in force, 18-month Layoff List, notice, personnel records, and payroll certification.

29. The City's Civil Service Rules define the following relevant terms:

a. "Classified Service" as all City positions not specifically excluded by the City Code at Rule 2.11.;

b. "Regular Employee" as an employee appointed under the Civil Service Rules to a permanent position who satisfactorily completed probation at Rule 2.24;

c. an employee in "Classified Service" as "all positions not specifically excluded by the Charter in accordance with these Rules"

30. Rule 9.2 of the Civil Service Rules provides that "The probationary period for an original appointment to a regular position shall be twelve (12) months. The probationary period upon promotion shall be six (6) months."

31. By virtue of her tenure with the City, Ms. Monestime was a "Regular Employee" in "Classified Service" under the City's Civil Service Rules and had a protected interest and a legitimate claim to continued employment, thereby establishing a protected property interest under the Fourteenth Amendment to the United States Constitution.

32. The City's Civil Service Rules establish and/or require the following in Rule 14:

a. A mandatory, sequential order of separation that must govern any layoff or reduction-in-force action by providing in Rule 14.1 that "Whenever it becomes necessary to reduce the number of employees within a given classification in any department through lack of funds, lack of work, or where there has been an insufficient appropriation to meet the salary requirements necessary to maintain existing personnel in any office, department, division, or other causes or when a position is abolished, employees in the Classified Service shall be laid off in order as follows: (1) Temporary employees. (2) Probationary Employees. (3) Regular Employees."

b. A mandatory process to determine who to be laid off in Rule 14.2 by providing that, "The order of lay-off shall be established by the City Manager based on an employee's work history, performance evaluations, discipline history, education, training, experience, and the needs of the City. Layoff lists by classification by department shall be established." Employees will be given two weeks' notice of any layoff. Pay equivalent to two weeks may be given in lieu of notice.

33. However, an employee who has been laid off is to then be placed on a Layoff List effective for 18 months, during which the affected employee could be subject to recall "in reverse order of Layoff by department and by classification" pursuant to Rules 14.3 and 14.4.

34. Rule 14.5. of the Civil Service Rules provides that "The Board does not have jurisdiction over any issue related to layoff including, but not limited to, the decision of the City to layoff employees, the order of layoffs, or recall. Accordingly, an employee may not file an appeal to the Board on any matter relating to layoff."

35. Rule 15 applies to situations involving discipline, the discipline process, and separations from employment.

36. Rule 16 identifies the circumstances under which an employee in Classified Service can appeal an employment decision and the appeal process and procedures.

**B. <u>The ALGO Investigation</u>**

37. On January 20, 2026, the City Commission passed a "Motion to approve to engage an independent third party reviewer selected by the City Manager with respect to procurement guidelines and operating entirely outside the City Attorney's Office to conduct a limited fact focused review of the governance and charter related concerns raised regarding staff interactions with a scope to include confidential staff interviews, document review, and any other fact finding necessary to clearly understand current practices and expectations and the firm retained must possess specific expertise in municipal governance and charter compliance and the review shall be conducted in an expedited basis with a written report submitted to the City Commission prior to the next regularly scheduled meeting and in all events no later than February 13, 2026 made by Commissioner Su, seconded by Vice Mayor Smukler."

38. Interim City Manager Plotkin spoke with Alvarez to discuss ALGO conducting the investigation as the "independent third party reviewer" and then, on January 28, 2026, sent an email to Alvarez advising that the City was looking for ALGO to conduct confidential interviews with the City Manager's Office Staff, City Department Directors and Assistant Directors to determine treatment from elected officials and any violations of the City Charter and to then provide a completed written report of the findings from the investigation by February 27, 2026.

39. Alvarez responded by email shortly thereafter with a proposed written agreement containing the terms under which ALGO would provide services to the City to perform the

investigation (February 2026 Retainer Agreement).

40. The City, through Interim City Manager Andrew Plotkin, and ALGO, through Ignacio Alvarez, signed the February 2026 Retainer Agreement on February 2, 2026, which provides as follows:

a. For ALGO to conduct a confidential investigation "to determine the treatment of [City] staff by elected officials and if any violations of the City Charter occurred in taking into account it's a Commission-Manager leadership style of government;"

b. For ALGO to handle the investigation "with the strictest of confidentiality;"

c. For ALGO to "provide a written report of findings of this investigation to the City Manager's Office by February 27, 2026;"

d. For ALGO to "destroy client files seven years after completion of matters" while making "reasonable efforts to notify [the City] in writing at least 30 days before the scheduled destruction date of any of your files;

e. To have permission "to communicate by cell phone, e-mail, facsimile, and other forms of electronic transmission" communication.

41. The City did not, however, hire or authorize ALGO to conduct a disciplinary investigation of Ms. Monestime or to determine whether Ms. Monestime engaged in misconduct.

42. On February 6, 2026, the City Attorney asked Shereece George Depusoir, Chief Procurement Officer, to identify the law firm retained to conduct the investigation, who selected the law firm, who approved the engagement, the cost to the City, and whether a procurement process was conducted to retain the firm.

43. The Chief Procurement Officer responded to the City Attorney that the engagement was structured to exclude the City Attorney's Office, that the City Commission authorized the City Manager to select and retain the law firm to conduct the investigation, that the engagement was within the City Manager's spending authority [under $50,000] and was retained under the legal services exemption found at Section 3-44(b) of the City Code, and that "the firm was retained under a not-to-exceed amount of $20,000, with established hourly rates of $500 for attorneys and $250 for investigators."

## C. <u>**Williams Coordinated With The ALGO Defendants To Direct And Shape The Investigation and Interim Report(s)**</u>

44. Despite the City retaining ALGO to conduct an "Independent Investigation,"

Williams regularly communicated and coordinated with ALGO and its investigators throughout the ongoing investigation.

45. Williams regularly and frequently met or spoke with investigators from ALGO, including Alvarez, Roig, and Hernandez, based on the billing records submitted by ALGO, their emails, and other communications, reflecting nearly daily communications.[1]

46. The ALGO Defendants understood that they were conducting an investigation at Williams's request "to determine whether elected officials – ***most notably Mayor Michael Joseph*** – engaged in conduct inconsistent with the Commission–Manager form of government, improperly interfered with administrative and procurement operations, or otherwise violated the City of North Miami Beach Charter and applicable ethics and procurement policies."

47. On the day the City hired ALGO, February 2, 2026, Roig and Hernandez each separately billed the City 5.5 hours for "arriving" at the NMB City Hall and meeting with Williams to "identify interview list, strategy of investigation, and logistics in conducting interviews."

48. On February 3, 2026, Roig and Hernandez met with Williams to discuss the case, identify the interview list, develop the strategy of the investigation, and address logistics for conducting interviews. Roig and Hernandez met with Williams and discussed the case, interview list, investigation strategy, and interview logistics.

49. Alvarez separately discussed with Roig and Hernandez the meeting with Williams, Williams's expectations, and next steps for the investigation. Alvarez separately billed time to discuss the meeting with Williams, Williams's expectations, and next steps for the investigation.

50. Williams contacted ALGO on February 12, 2026, to request that it provide an Interim Report by February 17, 2026.

51. After Alvarez, Roig, and/or Hernandez had nearly daily, if not daily, communications with Williams, Alvarez met with Williams on February 13, 2026, to discuss the status of the investigation and then ALGO provided Williams its Investigative Report before the Interim Report was finalized.

---

[1] Although Florida law required that ALGO, including Alvarez, Roig, Hernandez, and Norberto Hernandez, to retain all communications they had with the City, Williams, and the City's elected officials as public records in compliance with the Sunshine Act and the Florida Public Records Law, they deleted and/or destroyed text messages (and possibly other communications such as emails).

52. On February 13, 2026, Alvarez met with Williams to discuss the status of the investigation, and ALGO then drafted, reviewed, revised, and finalized the Interim Report.

53. Defendants then drafted, reviewed, revised, finalized, and transmitted a draft of the Interim Report to Williams for review and commentary on February 16, 2026.

54. Roig drafted and finalized the Interim Report, Alvarez reviewed, revised, and finalized it, and Alvarez transmitted the Interim Report directly to Williams on February 16, 2026, stating, "Please find attached our Interim Report of the internal investigation the Commission tasked us to do."

55. Alvarez and Roig meet with the Williams and Commissioners Su, Chernoff, Smith, and Smukler to discuss ALGO's Interim Report that same day, February 16, 2026.

56. Alvarez and Roig then returned to the City the next day to attend the City Commission Meeting.

57. Williams called ALGO and/or Alvarez on February 18, 2026, for confirmation about statements in the Interim Report regarding Interim HR Director Jacob Newman.

58. Alvarez sent a letter to Williams amending the Interim Report to replace the references to "City Attorney" with "Interim City Manager" for the statements regarding HR Director Newman.

59. On February 23, 2026, Alvarez emailed the Revised Interim Report to Williams.

60. Alvarez transmitted the Revised Interim Report to Williams on February 23, 2026, stating, "Mr. Manager, as discussed, please see attached."

**D. <u>Interview Of Ms. Monestime</u>**

61. Roig and Hernandez interviewed Ms. Monestime on February 10, 2026, during which she disclosed the following:

a. <u>Building Fund</u> – that the City's Building Fund had a $5.2 million reserve surplus that she believed was legally concerning, while also stating she did not know of improper expenditures, did not approve fund expenditures, and had no visibility into reserve management.

b. <u>Questionable Lobbying</u> – Miami Marketing Strategies/Ringo Cayard as a questionable lobbying transaction and stated she did not know how they were secured or whether they were actually lobbyists.

c. HR Concerns and Disclosures – Staff fears about reporting issues to the City's Human Resources Department due to concerns about affiliations with and/or information being provided to City Commissioners, complaints submitted without resolution and/or that were never addressed, and that Commissioner Smukler contacted Ms. Monestime within minutes of submitting her application for the City Manager position to Human Resources.

d. Travel Policy - Travel-policy issues, including instances where travel packets were completed after travel despite the requirement to submit them for prior approval.

e. Chain of Command – Elected officials sometimes went directly to staff and that she wanted a clearer process requiring elected-official requests to run through the Manager's Office.

f. Figgers Communications – With regard to Figgers Communication:

i. She did not suggest Figgers Communications and that the Mayor asked staff to schedule a conversation, after which she brought in IT, Procurement, and possibly Communications to assess whether it was something the City wanted to do.

ii. Procurement determined whether a bid waiver or exemption was appropriate, that she did not believe it was her role to question why a bid waiver was used, and that the approval process did not systematically run through her.

62. By disclosing the above-referenced issues to Roig and Hernandez from ALGO on February 10, 2026, Ms. Monestime engaged in protected activity concerning:

a. Building Fund – Actual or potential violation of law, gross mismanagement, gross waste, malfeasance, and/or gross neglect involving public funds.

b. Questionable Lobbying – Actual or potential violation of law, procurement irregularity, malfeasance, misfeasance, gross waste, or misuse of public funds.

c. HR Concerns and Disclosures – Actual or potential gross mismanagement, malfeasance, retaliation, abuse of authority, or gross neglect of duty in internal complaint handling.

d. Travel Policy - Actual or potential misuse of public funds, gross mismanagement, or misfeasance.

e. Chain of Command – Actual or potential Charter/governance violation, malfeasance, misfeasance, or gross mismanagement.

f. Figgers Communications - Actual or potential violation of law, elected-official/vendor-routing and procurement-process concerns

**E. Interview Of Ricardo Castillo**

63. ALGO interviewed Ricardo Castillo, the City's Chief Information Officer/IT Director, on February 6, 2026, as part of the City-authorized investigation.

64. Castillo's interview addressed, among other issues, vendor pressure, procurement irregularities, the Figgers Communications texting project, and the Mayor's alleged attempt to review, edit, or alter City Manager candidate interview recordings.

65. Castillo explained that elected officials did not always push vendors to him directly, but vendor-related pressure sometimes came indirectly through aides or the Interim City Manager, causing vendors to "jump" ordinary priority, budget, and operational considerations.

66. Castillo explained that he did not approve or sign off on the actual Figgers contract, that Interim City Manager Andrew Plotkin signed off on it, and that Castillo's own contract-approval process was circumvented.

67. Castillo discussed how Ms. Monestime brought the Figgers texting project to IT around June or July 2025, but only after it had been approved with a contract signed by Interim City Manager Andrew Plotkin.

68. Castillo's did not state or imply that Ms. Monestime directed Plotkin to approve Figgers or influenced Plotkin to approve Figgers.

69. Notwithstanding the limited nature of the answers and information Castillo provided in response to questioning, the Interim Report materially changed the nature of Castillo's statement by attributing to him having indicated that Plotkin granted approval of Figgers "allegedly under the influence" or "at the direction or influence" of Ms. Monestime.

70. The submission Alvarez made to the Florida Ethics Commission repeated that the approval for Figgers was granted "allegedly at the direction or influence" of Ms. Monestime.

71. ALGO falsely and misleadingly attributes to Castillo having associated Ms. Monestime with improper procurement influence, vendor steering, abuse of authority, and procurement misconduct, when his recorded interview did not contain any such statement(s) or inference(s).

72. Regarding the issue with the Mayor and the video-recorded City Manager interviews, Castillo explained that Mayor Michael Joseph asked him to coordinate Zoom recording

logistics for City Manager candidate interviews, that HR disconnected after the Mayor questioned why HR was present, and that the Mayor controlled the interview setup and recording process.

73. After conducting the interviews, the Mayor wanted to review the recordings before publication, wanted Castillo to use static images for each candidate instead of the live video feed, and became angry when Castillo said any edits would require a disclaimer that they had been altered and that the original recordings would be produced in response to public-records requests.

74. While upset by the Mayor's reaction, Castillo confirmed that the Mayor had done nothing wrong or illegal and had neither threatened him nor retaliated against him.

75. Castillo's did not state or indicate that Ms. Monestime knew of, approved, participated in, encouraged, or benefited from any request to alter any public record or interview recording, nor that Ms. Monestime engaged in dishonest conduct during the City Manager recruitment process.

76. Nevertheless, the Interim Report and related materials generated by ALGO juxtaposed Ms. Monestime's City Manager candidacy and remote interview location with allegations that the Mayor sought to review or alter interview recordings, creating the false implication that Ms. Monestime was connected to or benefited from the alleged public-record/video issue.

77. ALGO's attaching of Ms. Monestime's name to the alleged video-editing issue was false and misleading because Castillo's recorded interview attributed the recording issue to the Mayor and did not attribute any request, knowledge, participation, or wrongdoing to Ms. Monestime.

78. Castillo's interview also corroborated a politically charged, retaliatory, and fear-based work environment.

79. Castillo described the work environment as "weird" because elected officials applied indirect pressure and identified Figgers and Carbyne as examples where vendor pressure led to business with vendors.

80. Castillo's interview did not support ALGO's implication that Ms. Monestime engaged in procurement misconduct, recruitment/video-record misconduct, or any other misconduct in her employment with the City.

**F. <u>The Investigation And Interim Report Adversely Affected Ms. Monestime</u>**

81. Ms. Monestime met with Williams on or about February 4, 2026, during which he

told her that specific commissioners had expressed to him that they felt Ms. Monestime was not "warm" with them.

82. Several days later, on February 6, 2026, Ms. Monestime initiated a meeting with Williams in his office, during which they discussed various City-related matters, issues Williams was encountering, and Ms. Monestime's suggestions for addressing those issues he raised.

83. During that same meeting, Williams explained that several of the City's Commissioners had been pressing him to have Ms. Monestime removed from the City Manager's office; the two agreed that Ms. Monestime would be appointed as the City's Housing and Economic Development Director, and Williams stated that he would announce Ms. Monestime's new role the following week.

84. Before Ms. Monestime was appointed to the position of the City's Housing and Economic Development Director, and while she remained the Chief of Staff and Interim Assistant City Manager, Williams convened an impromptu meeting with Ms. Monestime and Human Resources personnel shortly after receipt of the Interim Report on February 16, 2026, during which he expressed "serious concerns" about the contents of the investigation report.

85. Williams instructed Ms. Monestime to vacate her office and work with Public Works immediately to find alternative office space at the close of the meeting with Human Resources.

86. Williams then changed his treatment of Ms. Monestime based on the information ALGO transmitted to him, including as included in the Interim Report.

87. After meeting with Williams to discuss her transition to her new role and pending items she was preparing to address in that new role on February 26, 2026, Williams emailed Ms. Monestime stating that Human Resources reminded him that a follow-up meeting was needed to "discuss disclosures in the investigative report."

88. After email exchanges on February 27, 2026, with Ms. Monestime attempting to schedule a follow-up meeting, Williams required Ms. Monestime to meet that day to discuss the Investigative Report, and, upon entering his office, Williams told Ms. Monestime of his decision to eliminate the Chief of Staff position, that the decision was non-disciplinary, and that it was effective immediately.

89. Ms. Monestime received a separation letter from the City terminating her employment on or about February 27, 2026, in which:

a. The City characterized the termination of her employment as an "organizational decision" and offered her two weeks of pay plus accrued paid time off and sick time.

b. The City did not characterize her termination as a disciplinary action or identify any cause for her removal.

90. The City did not process Ms. Monestime's separation as discipline, did not provide charges, did not notify her of any charges or reasons establishing cause for termination of her employment, and did not provide a pre-determination hearing or disciplinary appeal.

91. Rather than proceeding as required by its Civil Service Rules, Defendants engaged in the following acts that violated the rules, requirements, and provisions therein, including as follows:

a. not following the mandatory order of separation required by its Civil Service Rules; and

b. not appropriately considering Ms. Monestime's work history, stellar performance evaluations, lack of any discipline history, education, training, experience, and the needs of the City when deciding to terminate her employment.

92. The Civil Service Rules additionally require that regular employees subject to layoff be placed on a re-employment list and afforded recall rights: "[t]he names of the persons who held regular status in the Classified Service who have been subject to layoff shall be placed on an appropriate re-employment list for regular work in the order of their seniority, the most senior being first, for a period not to exceed one (1) year."

93. The City did not place Ms. Monestime on any re-employment list or advise her of any recall rights.

94. The termination of Ms. Monestime's employment bypassed the mandatory procedural safeguards established by the City's Civil Service Rules that should have protected her from the adverse employment action(s) taken thereon.

95. Ms. Monestime had no process to appeal or otherwise challenge the layoff, despite her request(s).

## G. <u>Further Publication And Weaponization Of Interim Report</u>

96. The City then passed Resolution No. R2026-31 to refer the interim investigative report and related records to the Office of the Miami-Dade State Attorney and to the Florida Commission on Ethics.

97. On February 18, 2026, Alvarez transmitted the Interim Report to the Miami-Dade State Attorney's Office by email to SAO Investigator Robert Fielder, after speaking with Public Corruption Unit Chief Tim VanderGiesen.

98. Alvarez then submitted a Complaint to the Florida Ethics Commission on March 3, 2026, regarding Mayor Michael Joseph, accompanied by the investigative findings from the Interim Report, which was assigned Complaint No. 26-097.

99. The Florida Ethics Commission voted to dismiss Complaint No. 26-097 on June 5, 2026.

## COUNT I
## VIOLATION OF 42 U.S.C. §1983
**(Procedural Due Process/Property Interest Claim Against Williams)**

Plaintiff, Marline Monestime, reincorporates and re-alleges all preceding paragraphs as though set forth fully herein and further alleges as follows:

100. At all times material hereto, Williams acted under color of state law in his capacity as City Manager of the City.

101. Ms. Monestime had a protected property interest in her continued employment with the City and Civil Service protections provided by the City's Civil Service Rules and Regulations.

102. Williams personally participated in, directed, and caused Ms. Monestime's termination.

103. Williams was, or reasonably should have been, aware of the City's Civil Service Rules as they relate to the layoff processes, procedures, and the procedural protections to which regular Civil Service employees (such as and including Ms. Monestime) are entitled.

104. As City Manager and a final policymaker, Williams was required to adhere to the City's Civil Service Rules for service layoff processes, procedures, and the procedural protections to which regular Civil Service employees (such as and including Ms. Monestime) are entitled.

105. Williams ordered or approved Ms. Monestime's termination without adherence to the mandatory procedural protections required by the City's Civil Service Rules.

106. Williams deprived Ms. Monestime of that property interest by terminating her employment effective immediately after using the ALGO Interim Report and "disclosures in the investigative report" for his adverse employment action(s).

107. Williams did not provide Ms. Monestime a meaningful opportunity to respond before the termination became effective.

108. Williams failed to comply with Rule 14 of the City's Civil Service Rules by failing to establish a layoff order based on the required factors, failing to establish a layoff list by classification and department, failing to place Ms. Monestime on an eighteen-month Layoff List, and failing to advise her of recall rights.

109. Williams similarly failed to comply with Rule 15 of the City's Civil Service Rules by failing to provide Ms. Monestime written notice of the reasons establishing cause for the termination of her employment, failing to provide a pre-determination hearing at least three days after written notice, and failing to issue a disciplinary decision subject to Rule 16 appeal.

110. By terminating Ms. Monestime's employment without following the mandatory procedural requirements and protections set forth in its own Civil Service Rules—including the required sequential order of layoff, the factors to be considered, Ms. Monestime's placement on a re-employment list, and the provision of recall rights—Williams deprived Ms. Monestime of her protected property interest without due process of law

111. Williams personally participated in the deprivation of Ms. Monestime's property interest in her continued employment with the City by using the information provided to him by ALGO (including the ALGO Interim Report) in his official capacity as City Manager, convening report-related meetings, directing Ms. Monestime to vacate her office, emailing her about "disclosures in the investigative report," and eliminating her position effective immediately.

112. Because Rule 14.5 bars Civil Service Board review of any issue related to layoff, Williams's labeling Ms. Monestime's layoff as "organizational" also deprived her of any internal Board appeal to challenge the asserted layoff basis.

113. Williams's use of an "organizational decision" label was a pretextual mechanism to terminate Ms. Monestime based on the ALGO report while avoiding both the layoff protections and the disciplinary protections in the City's Civil Service Rules.

114. At the time of the conduct alleged, the right of a public employee with a property interest in continued employment to receive a constitutionally adequate pre-deprivation process was clearly established.

115. Williams's actions, as set forth above, altered the compensation, terms, conditions, or privileges of the employment of Ms. Monestime and adversely affected her status as an employee without due process of law.

116. As a direct and proximate result of Williams's acts and omissions, Ms. Monestime has suffered and continues to suffer damages, including but not limited to: loss of past and future wages and benefits; loss of seniority rights; loss of retirement contributions and accruals; loss of professional reputation; emotional distress, mental anguish, humiliation, and loss of enjoyment of life; and other compensatory damages.

117. Williams's conduct was undertaken with knowledge of, or deliberate indifference to, Ms. Monestime's clearly established constitutional rights, entitling her to recover punitive damages from him.

118. Ms. Monestime is entitled to recover her attorney's fees and costs from Williams upon prevailing in this action.

WHEREFORE Plaintiff, Marline Monestime, demands the entry of a judgment in her favor and against Defendant, Darvin Williams, after trial by jury, declaring and determining that he violated her due process rights, reinstating her employment to the position she would have held, with all attendant wages, seniority rights and benefits, retirement contributions and accruals, awarding her damages, lost past and future wages and employment-related benefits, mental anguish and emotional distress damages, punitive damages, her attorney's fees, costs, all interest allowed by law, and such other relief as the Court deems just and proper.

## COUNT II
## VIOLATION OF 42 U.S.C. §1983
**(Procedural Due Process/Property Interest Claim Against The City)**

Plaintiff, Marline Monestime, reincorporates and re-alleges paragraphs 1 through 114 as though set forth fully herein and further alleges as follows:

119. The City was required to afford Ms. Monestime her due process rights, as guaranteed by the 5th and 14th Amendments to the United States Constitution, in connection with the deprivation of her property interest in her continued employment with the City.

120. The City acted through Williams, its City Manager and final policymaker, in making the decisions and taking the actions described herein that deprived Ms. Monestime of her property interest in her continued employment with the City without due process of law.

121. The City ordered or approved Ms. Monestime's termination without adherence to the mandatory procedural protections required by the City's Civil Service Rules.

122. The City deprived Ms. Monestime of that property interest when Williams terminated her employment effective immediately, and the City implemented and processed the termination.

123. The City did not provide Ms. Monestime a meaningful opportunity to respond before the termination became effective.

124. The City stated that the basis for terminating Ms. Monestime's employment was an "organizational decision," did not identify cause, and did not process the action as discipline.

125. The City failed to comply with Rule 14 of the City's Civil Service Rules by failing to establish a layoff order based on the required factors, failing to establish a layoff list by classification and department, failing to place Ms. Monestime on an eighteen-month Layoff List, and failing to advise her of recall rights.

126. The City similarly failed to comply with Rule 15 of the City's Civil Service Rules by failing to provide Ms. Monestime written notice of the reasons establishing cause for the termination of her employment, failing to provide a pre-determination hearing at least three days after written notice, and failing to issue a disciplinary decision subject to Rule 16 appeal.

127. By terminating Ms. Monestime's employment without following the mandatory procedural requirements and protections set forth in its own Civil Service Rules—including the required sequential order of layoff, the factors to be considered, Ms. Monestime's placement on an 18-month Layoff List—the City deprived Ms. Monestime of her protected property interest without due process of law.

128. The City's deprivation of Ms. Monestime's due process rights was not the product of a single unauthorized act by a lower-level employee but was directed and carried out by Williams in his capacity as City Manager – the final policymaker for the City – whose actions constitute

official City policy for purposes of municipal liability under 42 U.S.C. §1983, and were ratified by the City, as evidenced by the presence and involvement of HR Personnel during the meeting at which her employment was terminated, and the payments to her identified in the letter provided to her attendant with the termination of her employment.

129. The City's use of an "organizational decision" label was a pretextual mechanism to terminate Ms. Monestime based on the ALGO report while avoiding both the layoff protections and the disciplinary protections in the City's Civil Service Rules.

130. The City's actions, as set forth above, altered the compensation, terms, conditions, or privileges of Ms. Monestime's employment with the City and adversely affected her status as an employee without due process of law, for which she has no other remedy with the City or process for review.

131. The City is also liable because it authorized, received, used, paid for, adopted, ratified, published, and referred the ALGO investigation materials that Williams used against Ms. Monestime.

132. The City's official policy/custom/final decision included: authorizing ALGO's investigation and report(s), receiving the Interim Report(s), placing the Interim Report before the Commission, adopting Resolution R2026-31, transmitting and/or directing the Interim Report to be transmitted to outside authorities, and using it in the decision to terminate Ms. Monestime's employment.

133. As a direct and proximate result of the City's acts and omissions, Ms. Monestime has suffered and continues to suffer damages, including but not limited to: loss of past and future wages and benefits; loss of seniority rights; loss of retirement contributions and accruals; loss of professional reputation; emotional distress, mental anguish, humiliation, and loss of enjoyment of life; and other compensatory damages.

134. Ms. Monestime is entitled to recover her attorney's fees and costs from the City upon prevailing in this action.

WHEREFORE Plaintiff, Marline Monestime, demands the entry of a judgment in her favor and against Defendant, City of North Miami Beach, after trial by jury, declaring and determining that it violated her due process rights, reinstating her employment to the position she would have held, with all attendant wages, seniority rights and benefits, retirement contributions and accruals, awarding her damages, lost past and future wages and employment-related benefits,

mental anguish and emotional distress damages, her attorney's fees, costs, all interest allowed by law, and such other relief as the Court deems just and proper.

## COUNT III
## VIOLATION OF 42 U.S.C. §1983
**(Due Process Liberty Interest Claim Against Williams)**

Plaintiff, Marline Monestime, reincorporates and re-alleges paragraphs 1 through 99 as though set forth fully herein and further alleges as follows:

135. The Fourteenth Amendment prohibits Williams from depriving Ms. Monestime and other persons in public employment of liberty or property without due process of law.

136. The concept of liberty recognizes two particular interests of a public employee: (a) the protection of her good name, reputation, honor, and integrity, and (b) her freedom to take advantage of other employment opportunities.

137. The Fourteenth Amendment to the United States Constitution protects against the deprivation of a public employee's liberty interest in her reputation and good name where the employer publicly attributes stigmatizing charges to the employee in connection with her termination, without affording her a name-clearing hearing.

138. At all times material hereto, Williams acted under color of state law in his capacity as City Manager.

139. Williams used false and stigmatizing investigation materials that associated Ms. Monestime with procurement misconduct, improper vendor influence, City Manager recruitment irregularities, public-record/video alteration concerns, compensation irregularities, and "disclosures in the investigative report."

140. Williams treated the ALGO Interim Report as a basis for taking adverse employment action against Ms. Monestime.

141. Williams convened meetings with Ms. Monestime and HR concerning the ALGO Interim Report, expressed "serious concerns" about the report to Ms. Monestime, directed Ms. Monestime to vacate her office, emailed her about "disclosures in the investigative report," and terminated her employment with the City the next day.

142. The stigmatizing statements and implications in the Interim Report and related materials attributable to and about Ms. Monestime were false or materially misleading because,

during her employment, Ms. Monestime did not suggest Figgers, did not direct Interim City Manager Andrew Plotkin to approve Figgers, did not control procurement approvals, and had no involvement in the Mayor's alleged request concerning interview-video alteration.

143. The stigmatizing statements were made in connection with Ms. Monestime's termination because they were used during the meetings immediately preceding her separation and were expressly referenced in the email Williams sent to her on February 26, 2026.

144. The stigmatizing statements were published beyond Ms. Monestime because the Interim Report was transmitted to Williams, made available for Commission-related action, provided to persons and entities beyond the City and its elected officials, and sent to outside authorities – the Miami-Dade State Attorney's Office and Florida Ethics Commission:

a. The Miami-Dade State Attorney's Office has not initiated any prosecution, proceedings, or charges against Ms. Monestime; and

b. The Florida Ethics Commission dismissed the complaint for lack of legal sufficiency.

145. Ms. Monestime was not given a meaningful name-clearing hearing before or after the stigmatizing materials were used against her.

146. Ms. Monestime was not provided the ALGO Interim Report, source materials, or specific charges before the report-based meeting with Williams; she was not told she could request a public name-clearing hearing; and she was provided no procedure or forum to clear her name after publishing/referring the report.

147. Williams's conduct deprived Ms. Monestime of a protected liberty interest in her reputation, good name, and ability to pursue future employment.

148. Williams's conduct was undertaken with reckless or callous indifference to Mrs. Monestime's federally protected rights, entitling her to recover punitive damages from him.

149. As a direct and proximate result of Williams's acts and omissions, Ms. Monestime has suffered and continues to suffer damages, including but not limited to: loss of past and future wages and benefits; loss of seniority rights; loss of retirement contributions and accruals; loss of professional reputation; emotional distress, mental anguish, humiliation, and loss of enjoyment of life; and other compensatory damages

150. Ms. Monestime is entitled to recover her attorney's fees and costs from Williams upon prevailing in this action.

WHEREFORE Plaintiff, Marline Monestime, demands the entry of a judgment in her favor and against Defendant, Darvin Williams, after trial by jury, after trial by jury, declaring and determining he violated her due process rights, removing all stigmatizing information from her personnel and other files referring to her, awarding her a name-clearing hearing, compensatory damages, punitive damages, attorney's fees, costs, all interest allowed by law, and such other relief as the Court deems just and proper.

## COUNT IV
## VIOLATION OF 42 U.S.C. §1983
**(Due Process Liberty Interest Claim Against The City)**

Plaintiff, Marline Monestime, reincorporates and re-alleges paragraphs 1 through 99 and 135 through 147 as though set forth fully herein and further alleges as follows:

151. The City, through Williams and its authorized agents, created, adopted, used, published, republished, and relied on stigmatizing investigation materials concerning Ms. Monestime.

152. The City authorized and directed the ALGO investigation, monitored and received updates from ALGO (including written summaries of and during the investigation), received ALGO's Interim Report and related materials, paid ALGO for the work it performed and identified on the invoices submitted to the City, used the Interim Report and related materials against Ms. Monestime, and submitted and/or had ALGO submit the Interim Report and associated records to outside authorities.

153. The report and related materials were City public records generated for a City investigation and were subject to public-records requests and public-records litigation; the City and ALGO in fact produced, withheld, discussed, or litigated those materials as public records.

154. The City's actions falsely or misleadingly associated Ms. Monestime with procurement irregularities, vendor influence, City Manager recruitment irregularities, public-record/video alteration concerns, compensation irregularities, and report "disclosures."

155. The City altered Ms. Monestime's legal and employment status by terminating her employment effective immediately.

156. The City did not afford Ms. Monestime an opportunity to initiate any hearing or procedure to address the stigmatizing information about a name-clearing hearing or restore her good name and reputation.

157. The City is liable because Williams was the final policymaker for the employment decision, and because the City adopted and ratified the report's use and the termination of Ms. Monestime's employment attendant thereto.

158. The false statements of fact identified above have cast a disparaging cloud over Ms. Monestime's reputation for honesty and competency.

159. As a direct and proximate result of the violation(s) of Ms. Monestime's due process rights, including the deprivation of her liberty interests, she has sustained damages.

160. Mrs. Monestime is entitled to recover her attorney's fees and costs from the City upon prevailing in this action.

WHEREFORE Plaintiff, Marline Monestime, demands the entry of a judgment in her favor and against Defendant, City of North Miami Beach, after trial by jury, after trial by jury, declaring and determining it violated her due process rights, removing all stigmatizing information from her personnel and other files referring to her, awarding her a name-clearing hearing, compensatory damages, attorney's fees, costs, and all interest allowed by law, and such other relief as the Court deems just and proper.

## COUNT V
## CONSPIRACY IN VIOLATION OF 42 U.S.C. §1983
**(Against Williams and The ALGO Defendants)**

Plaintiff, Marline Monestime, reincorporates and re-alleges paragraphs 1 through 114, 119 through 132, 135 through 147, and 151 through 158 as though set forth fully herein and further alleges as follows:

161. The ALGO Defendants and Williams reached an understanding, express or implied, to develop, shape, publish, and use the ALGO investigation materials in a manner that would associate Ms. Monestime with misconduct and provide Williams with a basis to remove her from the City Manager's Office without Civil Service process or a name-clearing opportunity.

162. Williams, as City Manager and policymaker, acted under color of state law.

163. The ALGO Defendants were private actors who jointly participated with Williams in conduct that deprived Plaintiff of protected property and liberty interests.

164. The ALGO Defendants were not passive vendors.

165. The City retained ALGO for a City-authorized investigation.

166. The overt acts in furtherance of the conspiracy include the conduct alleged in paragraphs 44 through 60, including the strategy meetings, Williams-status discussions, draft/report transmissions, revisions, and Williams's immediate employment use of the report.

167. Williams's February 26 email and February 27 termination, as alleged above, are direct temporal and textual evidence of causation.

168. The timing, coordination, report discrepancies, and immediate employment use support a plausible inference that Williams and the ALGO Defendants reached an understanding to shape, publish, and use investigation materials in a manner that deprived Plaintiff of her protected employment and liberty interests.

169. The rights targeted were: (a) Ms. Monestime's liberty interest in her name and reputation without false stigmatizing publication attending discharge, and (b) her property interest in continued classified employment/Civil Service process.

170. The conspiracy and joint action caused Plaintiff deprivation of property without due process, deprivation of liberty without a name-clearing hearing, termination, reputational injury, and economic damages.

171. As a direct and proximate result of Williams's acts and omissions, Ms. Monestime has suffered and continues to suffer damages, including but not limited to: loss of past and future wages and benefits; loss of seniority rights; loss of retirement contributions and accruals; loss of professional reputation; emotional distress, mental anguish, humiliation, and loss of enjoyment of life; and other compensatory damages.

172. The conduct by Williams and the ALGO Defendants, as described above, was undertaken with knowledge of, or deliberate indifference to, Ms. Monestime's clearly established constitutional rights, entitling her to recover punitive damages.

173. Ms. Monestime is entitled to recover her attorney's fees and costs under 42 U.S.C. § 1988 against defendants liable under § 1983 upon prevailing in this action.

WHEREFORE Plaintiff, Marline Monestime, demands the entry of a judgment in her favor and against Defendants, Darvin Williams, ALGO Law Firm, LLP, Ignacio Alvarez, Franklin

Roig, and Norberto Hernandez, after trial by jury, awarding her damages, lost past and future wages and benefits, mental anguish and emotional distress damages, punitive damages, her attorney's fees, costs, all interest allowed by law, and such other relief as the Court deems just and proper.

## COUNT VI
## FLORIDA PUBLIC WHISTLEBLOWER ACT VIOLATION(S)
**(Against The City)**

Plaintiff, Marline Monestime, reincorporates and re-alleges paragraphs 1 through 99 as though set forth fully herein and further alleges as follows:

174. Section 112.3187, Florida Statutes, protects public employees from adverse personnel action for disclosing specified information, including violations or suspected violations of law and acts of gross mismanagement, malfeasance, misfeasance, gross waste of public funds, or gross neglect of duty.

175. The City required, requested, directed, or caused Ms. Monestime to participate in the investigation it contracted for ALGO to conduct.

176. The investigation ALGO conducted for the City was an "investigation, hearing, or other inquiry" within the meaning of Florida's Public Whistleblower Act, because it was authorized by the City, performed on behalf of the City, conducted by the City's retained investigators, involved confidential employee interviews, concerned potential violations of law, rule, regulation, Charter, procurement policy, ethics rules, and misuse of public authority, and resulted in ALGO's preparation and submission of an Interim Report (which was amended several times).

177. Ms. Monestime participated in the investigation ALGO conducted for the City by being interrogated by Roig and Hernandez from ALGO, purportedly on a confidential basis, and the interrogation was audio-recorded.

178. Ms. Monestime disclosed information to ALGO, through investigators Roig and Hernandez, concerning matters that fell within the categories protected by the Florida Public Whistleblower Act, including suspected violations of law, rule, regulation, Charter provisions, procurement requirements, malfeasance, misfeasance, gross mismanagement, misuse of public funds, and/or improper efforts to alter or manipulate official records, including:

a. a fiscal/legal compliance concern involving the City Building Fund's $5.2 million reserve surplus;

b. information concerning the allegation that the Mayor or others had requested that the video recording of her interview for the City Manager position be altered;

c. addressing her role in vendor-related allegations, including that she "pushed to secure" (Figgers) as a vendor when, by explaining her role was limited to coordinating a meeting requested or directed by others (and naming them);

d. elected officials bypassing staff and the Manager's Office.

e. HR reporting concerns and staff fears that complaints would not be addressed or would be shared with elected officials.

f. a questionable lobbying/vendor transaction involving Miami Marketing Strategies/Ringo Cayard.

g. travel-policy irregularities involving travel packets being completed after travel.

h. irregularities in the City Manager recruitment process, including relating to allegations that she read responses during the interview; and

i. concerning the American Rescue Plan Act ("ARPA") funds issue by explaining her role, stating that she acted at the prior City Manager's direction, and identifying Finance as the area that should be examined.

j. To the extent ALGO or Williams treated these issues as report disclosures, Ms. Monestime provided information that corrected mistaken facts and identified the City actors or departments responsible.

179. The protected activity included Ms. Monestime's requested participation and disclosures (that made their way into the investigative reports, summaries, and Interim Report).

180. The information Ms. Monestime provided to ALGO was protected because the Florida Public Whistleblower Act protects employees who disclose information concerning violations or suspected violations of law, rule, or regulation that create a substantial and specific danger to the public's health, safety, or welfare, and acts or suspected acts of gross mismanagement, malfeasance, misfeasance, gross waste of public funds, or gross neglect of duty.

181. Ms. Monestime's disclosures were made to a statutorily appropriate recipient because ALGO was retained by the City to conduct the City-authorized investigation, served as the City's investigator, reported directly to the City Manager and City officials, maintained the investigation file, and delivered the Interim Report to the City.

182. ALGO served as the City's designated investigative agent for receiving employee disclosures in a City-authorized investigation. Williams, as City Manager/chief

executive/appropriate local official, received the disclosures through ALGO's report and used them.

183. The disclosures were also reported into an investigation controlled by City officials, including Williams, who received and used the Interim Report.

184. ALGO conducted the investigation, met with Williams about strategy and status, worked with Williams in drafting and shaping the Interim Report, finalized the Interim Report, transmitted the Interim Report directly to Williams, and kept audio recordings and documentary materials in its investigation file.

185. Ms. Monestime's disclosures, as identified above, were made in a protected manner because she provided information based on the request/requirement to participate in the City's formal investigation being conducted by ALGO and provided the information during that investigative process to the ALGO investigators retained to act for the City.

186. ALGO's Interim Report incorporated information obtained from employee interviews, including disclosures concerning potential Charter violations, procurement issues, administrative interference, vendor-selection issues, official-record/video issues, and possible referral to outside authorities.

187. The Interim Report concluded that interviews produced allegations, documentation, and firsthand accounts indicating potential Charter and procurement violations, recommended further investigation, and stated that audio recordings and documentary materials were kept in ALGO's investigation file.

188. The City, Williams, and ALGO understood that Ms. Monestime's protected disclosures were part of the investigation materials because Williams later expressly tied his desire to meet with Ms. Monestime to "disclosures in the investigative report" in his email to her on February 26, 2026.

189. Williams's February 26 email and February 27 termination, as alleged above, are direct temporal and textual evidence of causation.

190. The close temporal proximity, Williams's express reference to report "disclosures," and the shift from planned transition to immediate termination on February 27, 2026, support causation.

191. The City's stated explanation that Ms. Monestime's termination was an "organizational decision" was pretextual for, among other reasons:

a. Ms. Monestime had not previously been informed of any issues with her job duties or performance;

b. Williams tied the decision-making process to the investigation disclosures, confronted Ms. Monestime with report-based accusations, and terminated her immediately after stating that he needed to meet with her regarding "disclosures in the investigative report."

c. The City's asserted organizational-decision rationale was pretextual because the City did not follow its Civil Service Rules.

d. Williams and/or the City have advertised and/or hired for positions that, individually or collectively, perform the same or similar job functions as Ms. Monestime (or that she would have performed as the City's Housing and Economic Development Director); and

e. Additional reasons to be uncovered through discovery.

192. The City did not follow Civil Service Rule 14 layoff order, Rule 14.2 factors, layoff-list/recall requirements, or, if the action was report-based discipline, Rules 15 and 16.

193. The City took adverse action by retaliating against Ms. Monestime because of information she disclosed while participating in the City-authorized investigation, in violation of the Florida Public Whistleblower Act.

194. The City's actions, as set forth above, altered the compensation, terms, conditions, or privileges of Ms. Monestime's employment with the City and adversely affected her status as an employee

195. Ms. Monestime brings this claim within 180 days of February 27, 2026.

196. No adequate local administrative whistleblower procedure was available or required before filing, or alternatively any administrative prerequisite was satisfied, waived, excused, or unavailable because the City treated the termination as final and provided no whistleblower procedure.

197. As a direct and proximate result of the City's acts and omissions, Ms. Monestime has suffered and continues to suffer damages, including the loss of past and future wages, benefits, and seniority; loss of retirement contributions and accruals; loss of professional reputation; emotional distress, mental anguish, humiliation, and loss of enjoyment of life; and other compensatory damages.

198. Ms. Monestime is entitled to recover her attorney's fees and costs from the City upon prevailing in this action.

WHEREFORE Plaintiff, Marline Monestime, demands the entry of a judgment in her favor and against Defendant, City of North Miami Beach, after trial by jury, reinstating her employment to the position she would have held, with all attendant wages, benefits, seniority rights, retirement contributions and accruals, awarding her damages, lost past and future wages and employment-related benefits, mental anguish and emotional distress damages, awarding her attorney's fees, costs, and all interest allowed by law, and such other relief as the Court deems just and proper.

## COUNT VII
## TORTIOUS INTERFERENCE
**(Against The ALGO Defendants)**

Plaintiff, Marline Monestime, reincorporates and re-alleges paragraphs 1 through 99 as though set forth fully herein and further alleges as follows:

199. Ms. Monestime's employment with the City provided her legal and economic rights, including wages, benefits, continued employment, professional standing, advancement opportunities, civil-service rights, and other employment-related benefits.

200. Ms. Monestime also had an identifiable prospective business and employment relationship with the City for the Housing and Economic Development Director position.

201. Ms. Monestime accepted Williams's offer to transition to the City's Housing and Economic Development Director, in which capacity she would continue her employment with the City.

202. Ms. Monestime's existing employment and prospective appointment were not speculative, as she was an existing employee of the City with rights afforded by the Civil Service Rules, and her forthcoming transition arose from an express discussion and agreement between Ms. Monestime and City Manager Williams, who had appointing authority and was responsible for the City's administrative employment decisions.

203. The ALGO Defendants knew or reasonably should have known that Ms. Monestime was a City employee whose employment status, reputation, and continued relationship

with the City could be affected by the investigation materials they created and published and the information they disseminated as a result of their investigation.

204. The ALGO Defendants knew or reasonably should have known that Ms. Monestime was not just a witness but a senior City employee, recent City Manager candidate, Chief of Staff, and Interim Assistant City Manager, and that the Interim Report would be delivered to the City Manager with authority over her employment

205. The ALGO Defendants also knew or reasonably should have known that the investigation materials they created and the information they disseminated resulting from the investigation would be used by the City Manager, Human Resources, the City Commission, and other City officials for official City purposes, including employment, administrative, and public-records purposes.

206. The ALGO Defendants created, drafted, edited, transmitted, and published investigation materials and disseminated information that falsely or misleadingly associated Ms. Monestime with misconduct, dishonesty, recruitment irregularities, and fiscal mismanagement by:

a. Figgers procurement influence/vendor steering;

b. City Manager recruitment irregularities/reading responses;

c. video/public-record alteration;

d. compensation/PTF irregularities if the report implied she caused or benefited from them; and

e. ARPA/Building Fund.

207. The ALGO Defendants' investigation materials included or incorporated references to Ms. Monestime, including her personnel transaction form, quarterly gift disclosure, and status as one of four City Manager finalists.

208. The ALGO Defendants' investigation materials, including the Interim Report(s), alleged or implied Ms. Monestime engaged in or was complicit in "Recruitment Process Irregularities and Perception Risk" in connection with the City Manager recruitment process.

209. The ALGO Defendants' statements and omissions falsely implied that Ms. Monestime participated in, benefitted from, or was associated with improper recruitment practices, dishonest interview conduct, favoritism, or manipulation of the City Manager selection process.

210. The ALGO Defendants' investigation materials also generated or transmitted allegations later used by Williams to accuse Ms. Monestime of appearing to read responses during her City Manager interview, being connected to a request to alter video of her video-recorded interview for the City Manager position, and pushing to secure Figgers as a vendor with the City.

211. Williams later raised "serious concerns" based on the information disclosed to him from the investigation, including that Ms. Monestime read responses during her interview for City Manager, that the Mayor requested IT to alter the video of her interview for City Manager, and that Ms. Monestime pushed to secure Figgers as a vendor for the City, while the recorded interview of Ms. Monestime is clear that she was not involved in the Mayor's request to replace the video of her interview for City Manager with a static image (or otherwise alter that video) and stated she only coordinated a meeting with the vendor at issue.

212. Those accusations were false, materially incomplete, and misleading, as the investigation did not result in the discovery of any evidence supportive of the allegations against Ms. Monestime, as she responded to ALGO investigators that she:

a. Did not request, approve, participate in, or have any involvement in the alteration of any video or public records;

b. Did not request, suggest, or urge anyone to alter the video recording of her interview for City Manager;

c. Did not improperly steer, select, secure, or push a vendor (including Figgers) for or to the City;

d. Did not engage in dishonest interview conduct or compromise the integrity of the City Manager recruitment process;

e. Was not responsible for the $5.2 million surplus or the ARPA funds issues;

f. Followed the City's *de facto* practice in completing travel packets; and

g. Did not engage in any improprieties or activities violative of a law, rule, regulation, or City Charter provision.

213. The ALGO Defendants knew or should have known that publishing unverified, misleading, or incomplete accusations about Ms. Monestime would foreseeably interfere with her employment relationship with the City and impending transition to the Housing and Economic Development Director role.

214. The ALGO Defendants did not conduct a neutral, confidential investigation; instead, they coordinated with Williams on investigation strategy, interview logistics, expectations, report status, and report revisions.

215. The ALGO Defendants' conduct constituted intentional interference because they knowingly created and supplied investigation materials that they knew or should have known would be used by Williams and the City in connection with decisions involving Ms. Monestime's employment status.

216. The ALGO Defendants' interference was unjustified and improper because they exceeded the authorized scope of the investigation authorized by the City, published knowingly false and misleading statements or implications concerning Ms. Monestime, failed to fairly include Ms. Monestime's explanations and denials, failed to distinguish unverified allegations from findings, failed to include exculpatory statements and evidence obtained during their investigation, and provided materials that foreseeably stigmatized Ms. Monestime and interfered with her employment.

217. The ALGO Defendants' interference was further unjustified because the City retained ALGO to investigate elected-official conduct and Charter issues, not to create disciplinary allegations against Ms. Monestime or interfere with her continued employment.

218. Even if the ALGO Defendants had a qualified interest in the investigation, they were or became a stranger to Ms. Monestime's employment expectancy by acting outside the authorized scope, publishing misleading implications, and converting witness information into employment-damaging accusations.

219. The ALGO Defendants' interference was accomplished through improper means, including false statements, defamatory implications, misleading omissions, negligent or reckless investigation practices, and coordinated publication of such investigation materials to Williams and City officials.

220. The ALGO Defendants' improper conduct directly affected Ms. Monestime's employment relationship.

221. The ALGO Defendants' tortious conduct includes the conduct alleged in paragraphs 44 through 60, including the strategy meetings, Williams-status discussions, draft/report transmissions, revisions, and Williams's immediate employment use of the report.

222. Williams's February 26 email and February 27 termination, as alleged above, are direct temporal and textual evidence of causation.

223. The ALGO Defendants' investigation materials and publications were a substantial factor in causing Williams and the City to halt Ms. Monestime's transition to the position of Housing and Economic Development Director, remove Ms. Monestime from her office, and terminate her employment.

224. But for the ALGO Defendants' false and misleading investigation materials, including the statements and implications contained therein, Williams would have transitioned Ms. Monestime to the City's Housing and Economic Development Director position instead of removing her from her office and terminating her employment the next day.

225. The ALGO Defendants' conduct was not privileged because they did not provide neutral, accurate information within the scope of the City's requested investigation, but instead used improper means, including false statements, defamatory implications, misleading omissions, and publication of unverified allegations that associated Ms. Monestime with misconduct.

226. The ALGO Defendants were outside investigators and legal vendors who interfered with Ms. Monestime's employment relationship by creating and publishing false and misleading report materials that foreseeably caused adverse action against Ms. Monestime, not parties to Ms. Monestime's employment relationship with the City.

227. The ALGO Defendants lost or exceeded any privilege they had to communicate with the City by acting with improper means, including falsehood, misleading implication, reckless disregard for accuracy, and conduct outside the investigation's authorized scope.

228. The ALGO Defendants' unjustified interference with Ms. Monestime's employment and prospective employment with the City caused her damages, including lost wages, lost benefits, loss of the Housing and Economic Development Director opportunity, loss of continued City employment, reputational harm, emotional distress, loss of professional standing, and impairment of future employment opportunities.

229. ALGO is liable for its own conduct and for the conduct of Alvarez, Roig, Hernandez, and other ALGO agents, employees, attorneys, investigators, and representatives acting within the course and scope of ALGO's investigation and report work.

230. Alvarez is individually liable because he communicated directly with Williams, coordinated with him about strategy and objectives, reviewed, revised, finalized, transmitted, and

republished the Interim Report(s), and participated in the conduct that foreseeably interfered with Ms. Monestime's employment relationship.

231. Roig and Hernandez are each individually liable to Ms. Monestime because they participated in investigation strategy, interviews, drafting, and finalizing the Interim Report, and helped create the report materials that interfered with Ms. Monestime's employment relationship (including by preparing questions, meeting with Williams and others about strategy and logistics, interview list, conducting interviews, and drafting and revising summaries, executive summaries, and/or the Interim Report(s)).

232. As a direct and proximate result of the ALGO Defendants' tortious interference, Ms. Monestime has suffered and continues to suffer damages, including but not limited to: loss of past and future wages and benefits; loss of seniority rights; loss of retirement contributions and accruals; loss of professional reputation; emotional distress, mental anguish, humiliation, and loss of enjoyment of life; and other compensatory damages.

WHEREFORE Plaintiff, Marline Monestime, demands the entry of a judgment in her favor and against Defendants, ALGO Law Firm, LLP, Ignacio Alvarez, Franklin Roig, and Norberto Hernandez, after trial by jury, awarding her damages, lost past and future wages and employment-related benefits, retirement contributions and accruals, mental anguish and emotional distress damages, punitive damages, all interest allowed by law, costs of this action, and such other relief as the Court deems just and proper.

## COUNT VIII
## DEFAMATION
**(Against The ALGO Defendants)**

Plaintiff, Marline Monestime, reincorporates and re-alleges paragraphs 1 through 99 as though set forth fully herein and further alleges as follows:

233. The ALGO Defendants published false and defamatory statements and implications in the Interim Report, Revised Interim Report, investigation summaries, Ethics Commission submission, and related investigation materials, directly or indirectly asserting that Ms. Monestime engaged in or was connected to improper procurement influence, vendor steering, recruitment irregularities, public-record/video manipulation, and irregular City employment or compensation matters.

234. The ALGO Defendants published that Figures approval was granted by Plotkin "under the influence" or "at the direction or influence" of Ms. Monestime.

235. That statement and implication were false or materially misleading.

236. Ms. Monestime's recorded interview makes clear that she did not suggest Figgers and only scheduled a conversation after the Mayor asked staff to see whether the City wanted to consider the service, involving IT, Procurement, and possibly Communications.

237. Castillo's recorded interview confirms that Interim City Manager Plotkin was primarily involved in the City's contracting with Figgers as a vendor without any indication from Castillo or any other witness that Ms. Monestime directed Plotkin to approve Figgers, improperly influenced Plotkin's approval, or had any approval authority over the procurement.

238. The ALGO Defendants also published or republished materials that juxtaposed Ms. Monestime's City Manager candidacy and interview location with the Mayor's alleged effort to review, edit, or alter interview recordings.

239. The ALGO Defendants' Interim Report's juxtaposition falsely implied Ms. Monestime participated in, knew of, requested, or benefited from an attempted alteration of official public records – i.e., the video recording of her interview for City Manager.

240. The implication that Ms. Monestime participated in, requested, benefited from, or was connected to any attempted public-record/video alteration was false and known to the ALGO Defendants to be false when made and published.

241. Castillo's recorded interview identifies the Mayor as the actor who controlled recording logistics and sought to display a static image, instead of the actual video feed, for the video recordings of the City Manager candidate interviews; it does not implicate Ms. Monestime in the alleged public-record/video issue.

242. The defamatory statements and implications tended to lower Ms. Monestime in the estimation of the community, injure her professional reputation, deter others from associating or dealing with her, and prejudice her in her profession as a municipal administrator.

243. The ALGO Defendants published the statements to Williams (including on February 13-19, 2026), City officials (February 16, 2026), the City Commission (February 16-17, 2026), outside oversight authorities (Miami-Dade State Attorneys' Office on February 18, 2026, and Florida Ethics Commission on March 3, 2026), and others through official referral and public-record channels.

244. The ALGO Defendants acted at least negligently, if not knowingly and intentionally, when they had the recordings/transcripts of the witness interviews; knew that Ms. Monestime denied suggesting Figgers; knew that Castillo attributed approval of Figgers to Plotkin; knew Castillo attributed the video issue to the Mayor; and nevertheless used "direction or influence" and omitted exculpatory context.

245. The ALGO Defendants also acted with knowledge of falsity or reckless disregard because they possessed or created the interview transcripts, recordings, summaries, and source materials showing the limited and exculpatory nature of Ms. Monestime's and Castillo's testimony.

246. Any qualified privilege was exceeded or lost because the ALGO Defendants acted outside the authorized scope, published misleading implications to persons/entities beyond those necessary for the investigation, omitted known exculpatory facts, and acted with express malice or reckless disregard for their truth/falsity.

247. The statements by the ALGO Defendants about Ms. Monestime were defamatory *per se* because they imputed misconduct incompatible with public employment and prejudiced Ms. Monestime in her profession.

248. The defamatory statements and implications caused Ms. Monestime's termination, loss of the Housing and Economic Development Director role, reputational harm, lost wages and benefits, loss of retirement contributions and accruals; loss of professional reputation; emotional distress, mental anguish, humiliation, and loss of enjoyment of life emotional distress, and impairment of future employment opportunities.

WHEREFORE Plaintiff, Marline Monestime, demands the entry of a judgment in her favor and against Defendants, ALGO Law Firm, LLP, Ignacio Alvarez, Franklin Roig, and Norberto Hernandez, after trial by jury, awarding her compensatory damages, special damages, reputational damages, mental anguish and emotional distress damages, punitive damages, costs, all interest allowed by law, and such other relief as the Court deems just and proper.

## COUNT IX
## Florida Civil Conspiracy
**(Against Williams and The ALGO Defendants)**

Plaintiff, Marline Monestime, reincorporates and re-alleges paragraphs 1 through 99, 174 through 196, 199 through 228, and 233-247 as though set forth fully herein and further alleges as

follows:

249. Ms. Monestime pleads this civil conspiracy as derivative of the underlying torts/claims of defamation and tortious interference.

250. Williams and the ALGO Defendants agreed, expressly or tacitly, to generate, shape, publish, and use the investigation and investigation materials and reports that exceeded the authorized investigation scope and falsely or misleadingly implicated Ms. Monestime in misconduct or irregularities.

251. The agreement may be inferred from the coordinated meetings, reports exchanged, report revisions, transmission of materials to Williams, immediate use of the report against Ms. Monestime, and republication of the Interim Report (and its contents) to outside authorities such as the Miami-Dade State Attorney's Office and Florida Ethics Commission.

252. The object of the conspiracy was to use the investigation and report materials to justify or facilitate adverse action against Ms. Monestime while avoiding the City's Civil Service protections.

253. The overt acts in furtherance of the conspiracy include the conduct alleged in paragraphs 44 through 60, including the strategy meetings, Williams-status discussions, draft/report transmissions, revisions, and Williams's immediate employment use of the report.

254. As a direct and proximate result of the conspiracy, Ms. Monestime has suffered and continues to suffer damages, including but not limited to: loss of past and future wages and benefits; loss of seniority rights; loss of retirement contributions and accruals; loss of professional reputation; emotional distress, mental anguish, humiliation, and loss of enjoyment of life; and other compensatory damages.

WHEREFORE Plaintiff, Marline Monestime, demands the entry of a judgment in her favor and against Defendants, Darvin Williams, ALGO Law Firm, LLP, Ignacio Alvarez, Franklin Roig, and Norberto Hernandez after trial by jury, awarding her damages, lost past and future wages and employment-related benefits, mental anguish and emotional distress damages, her attorney's fees, costs, all interest allowed by law, and such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, Marline Monestime, demands a trial by jury of all issues so triable.

Respectfully submitted this 25th day of August 2026,

s/Brian H. Pollock, Esq.
Brian H. Pollock, Esq. (174742)
brian@fairlawattorney.com
FAIRLAW FIRM
135 San Lorenzo Avenue
Suite 770
Coral Gables, FL 33146
Tel: 305.230.4884
*Counsel for Plaintiff*